**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**UNITED STATES OF AMERICA**,

v.

**MARCOS REID-VARGAS**, *et al.*,

Defendants.

Criminal No. 14-0747 (CCC/BJM)

### REPORT AND RECOMMENDATION

Defendants Marcos Reid-Vargas ("Reid"), Marcos Renasco-Padilla ("Renasco"), and Jose Chavarria-Garita were charged with violating the Maritime Drug Law Enforcement Act ("MDLEA" or "Act"), 46 U.S.C. § 70503(a)(1). Docket No. 12. Reid moved to dismiss the indictment. Docket No. 22 ("Mot."). The government opposed, Docket No. 23, and Reid replied, Docket No. 28. The matter was referred to me for a report and recommendation. Docket No. 24.[1] For the reasons below, I recommend that Reid's motion be **denied**.

### BACKGROUND

*The Facts*[2]

On November 23, 2014, a maritime patrol aircraft observed a suspicious vessel in international waters about 60 nautical miles southeast of San Andrés, an island belonging to Columbia. The vessel, later identified as the M/V *Secret Magic*, had three people on board, later identified as defendants, all foreign nationals. When defendants noticed the aircraft, they tossed approximately 30 packages overboard; the *Secret Magic* was, at that point, about 45 nautical miles south of San Andrés. Some time later, the United States Coast Guard Cutter ("USCGC") *Decisive* arrived on the scene and launched a boarding team to intercept the *Secret Magic*. Upon approach, the team noted that the vessel, a blue-hulled go-fast boat with a 200-horsepower outboard engine, bore no visible indicia of nationality.

---

[1] Renasco subsequently moved to join in Reid's motion and reply. Docket No. 29.

[2] These facts are drawn from the affidavit supporting the government's criminal complaint. Docket No. 1-1. Reid does not affirmatively contest the government's facts, present a contrary account, or request an evidentiary hearing. I therefore assume the supporting affidavit's truth for present purposes.

The Columbian Navy, prompted by a request for assistance, dispatched two vessels to the location where the *Secret Magic*'s occupants had been seen jettisoning its cargo. They recovered from the sea 20 bales of a green leafy substance. The Colombian Navy reported that the bales contained, in total, approximately 680 kilograms of marijuana, and transferred a sample of the marijuana to the Coast Guard.

The Coast Guard boarding team conducted right-of-approach questioning. Reid, the vessel's master, claimed that the *Secret Magic* was registered in Costa Rica; he was, however, unable to produce any documentation to that effect. The Coast Guard boarded the vessel pursuant to a bilateral agreement between the United States and Costa Rica regarding high-seas drug smuggling. On the deck, the boarding team found, in plain view, multiple small amounts of suspected marijuana, and further inspection turned up more suspected marijuana in other areas of the vessel. Field tests confirmed that these substances were marijuana. In addition, ion-scan swipes of the vessel resulted in five high-concentration hits for methamphetamine and one low-concentration hit for cocaine.

Costa Rica was contacted regarding the nationality of the *Secret Magic* and responded that it could neither confirm nor deny Reid's claim of Costa Rican registry. The Coast Guard proceeded to treat the *Secret Magic* as a vessel without nationality. Defendants were detained and transferred, along with the recovered contraband, to the USCGC *Seneca*. After the Coast Guard determined that the *Secret Magic* could not be safely towed, the *Decisive* destroyed it as a hazard to navigation. The *Seneca* transported defendants to San Juan, Puerto Rico, where they were taken into custody.

### The Indictment

The two-count indictment alleges that defendants, "on the high seas, elsewhere, and within the jurisdiction of this Court," (1) knowingly and intentionally conspired to possess with intent to distribute at least 100 kilograms of marijuana, a controlled substance, on board a vessel "without nationality" and therefore, under 46 U.S.C. § 70502(c)(1)(A), subject to the jurisdiction of the United States, in violation of 46 U.S.C. §§ 70503(a)(1), 70504(b)(1), and

70506(a)–(b); and (2) aided and abetted by each other, knowingly and intentionally possessed at least 100 kilograms of marijuana on board a vessel without nationality, in violation of 18 U.S.C. § 2 and 46 U.S.C. §§ 70503(a)(1), 70504(b)(1), and 70506(a). Docket No. 12, at 1–2. The indictment also contains a forfeiture allegation. *Id.* at 3.

## DISCUSSION

Reid argues that the MDLEA, as applied to his alleged conduct, is unconstitutional (1) because it exceeds Congress's power to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations," U.S. Const. art. I, § 8, cl. 10 (the "Define and Punish Clause"); (2) because it is not a valid exercise of Congress's power to implement treaties; and (3) because it is an ex post facto law.[3] These arguments are without merit.

**I.   The Act**

The MDLEA makes it unlawful for any person to "knowingly or intentionally manufacture or distribute, or possess with intent to manufacture or distribute, a controlled substance on board" three categories of vessels, including, as relevant here, vessels "subject to the jurisdiction of the United States." 46 U.S.C. § 70503(a)(1). A vessel "subject to the jurisdiction of the United States" is defined to include "a vessel without nationality." *Id.* § 70502(c)(1)(A). A "vessel without nationality," in turn, is defined to include:

(A) a vessel aboard which the master or individual in charge makes a claim

---

[3] Reid seems, at first blush, to mount a facial challenge to the MDLEA. I conclude, however, that his motion is better read as contesting Congress's authority to proscribe and punish his particular conduct. Though he opens with the broad pronouncement that the Act as a whole "is an *ultra vires* exercise of Congressional power," Mot. 1, Reid later clarifies that he disputes the Act's validity "*to the extent* that [it] seeks to punish foreigners committing offenses on foreign vessels," *id.* 6 (emphasis added). To the extent some ambiguity remains, my interpretation of Reid's argument is informed by the fact that facial challenges are both difficult, *United States v. Salerno*, 481 U.S. 739, 745 (1987), and disfavored, *Sabri v. United States*, 541 U.S. 600, 609 (2004). To succeed on a claim that the MDLEA is facially unconstitutional, Reid would have to establish "'that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *Salerno*, 481 U.S. at 745), or at least that the Act has no "plainly legitimate sweep," *id.* (quoting *Washington v. Glucksberg*, 521 U.S. 702, 739–40 & n.7 (1997) (Stevens, J., concurring in judgments)). He makes no effort to do so.

>    of registry that is denied by the nation whose registry is claimed;
>
>    (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and
>
>    (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

*Id.* § 70502(d)(1). The Act specifically provides that it applies to offenses "committed outside the territorial jurisdiction of the United States." *Id.* § 70503(b). It contains no explicit requirement that there be a nexus between a defendant's conduct and the United States. *United States v. Nueci-Peña*, 711 F.3d 191, 197 (1st Cir. 2013); *see* 46 U.S.C. § 70502(c).

## II.     Congress's Power to Prohibit Reid's Conduct Under the MDLEA

Reid's primary argument is that Congress lacks the power, under the Define and Punish Clause, to proscribe drug trafficking on the high seas without requiring some nexus between the proscribed conduct and the United States. As he reads it, the Define and Punish Clause comprises three separate grants of power over three separate classes of crimes: piracies, felonies on the high seas, and offenses universally cognizable under international law. *See United States v. Cardales-Luna*, 632 F.3d 731, 741, 745 (1st Cir. 2011) (Torruella, J., dissenting); *United States v. Shi*, 525 F.3d 709, 721 (9th Cir. 2008) (citing *United States v. Smith*, 18 U.S. (5 Wheat) 153, 158–59 (1820)). Only the first and third of these grants, Reid says, imbue Congress with authority to exercise "universal jurisdiction"—that is, extraterritorial jurisdiction over criminal conduct with no connection to the United States. The "Felonies committed on the high seas" power is narrower, limited to crimes with a United States nexus. Reid urges that, because drug trafficking is neither piracy, defined strictly as "robbery upon the sea," *Smith*, 18 U.S. at 162, nor a crime that customary international law recognizes as universally cognizable, it can be punished extraterritorially only as a "Felony" and, therefore, only if the government is required to prove a nexus to the

United States.

Before addressing the merits of Reid's position, I engage in a brief survey of decisions, within this circuit and without, addressing the MDLEA's constitutionality. The First Circuit has noted that the Act "is derived from Congress's power" under the Define and Punish Clause, *United States v. Mitchell-Hunter*, 63 F.3d 45, 49 n.3 (1st Cir. 2011), and that Congress, in making drug trafficking unlawful under the Act, was "[i]nvoking" that power, *United States v. Matos-Luchi*, 627 F.3d 1, 3 (1st Cir. 2010). The court has not, however, squarely passed on whether Congress's authority to "define and punish . . . Felonies on the high seas" is restricted to crimes with a United States nexus.

Reid's argument is heavily indebted to—in fact, lifted almost wholesale from—a forceful dissent by Judge Torruella contending, sua sponte, that the MDLEA's application to a foreign national aboard a foreign-registered vessel was an "*ultra vires* extension of [Congress's] Article I legislative powers to foreign territory, as applied to persons and/or activities that have no nexus with the United States." *Cardales-Luna*, 632 F.3d at 739 (Torruella, J., dissenting) (footnotes omitted). Judge Torruella, in turn, relied in large part on the analysis of a single scholar. *See id.* at 739, 741–50 (citing Eugene Kontorovich, *Beyond the Article I Horizon: Congress's Enumerated Powers and Universal Jurisdiction Over Drug Crimes*, 93 Minn. L. Rev. 1191 (2009)). Because the defendant in *Cardales-Luna* did not, either in the district court or on appeal, challenge Congress's Article I authority to enact the MDLEA or to apply it to his conduct, the majority declined to consider the issue. *Id.* at 632 F.3d at 737–39 (majority opinion).

In *United States v. Nueci-Peña*, 711 F.3d 191 (1st Cir. 2013), the First Circuit was for the first time properly confronted with Judge Torruella's argument—the argument now made by Reid. *See id.* at 197 (describing defendant's argument "that Congress exceeded its authority under the Piracies and Felonies Clause in enacting the MDLEA without requiring a nexus between the conduct and the United States"). The defendant, however, presented the issue for the first time on appeal, and the court accordingly reviewed the decision below only

for plain error. *Id.* Pointing to its "sister circuits' view that the MDLEA is a constitutional exercise of Congress' power under the Piracies and Felonies Clause and the absence of Supreme Court precedent addressing the scope of that power in this context," the court held that, if the defendant's conviction was the result of any error by the district court, the error was not plain. *Id.*

As the First Circuit observed in *Nueci-Peña*, other courts have weighed in on the MDLEA's constitutionality. The Third and Fifth Circuits have, without significant analysis, identified the Define and Punish clause as the source of Congress's authority to enact the MDLEA. *United States v. Ledesma-Cuesta*, 347 F.3d 527, 531–32 (3d Cir. 2003); *United States v. Suerte*, 291 F.3d 366, 376–77 (5th Cir. 2002); *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993). The Ninth and Eleventh Circuits have rejected challenges that the MDLEA exceeds Congress's Article I powers, though neither court appears to have grappled to any great extent with the precise argument here pressed by Reid. *United States v. Campbell*, 743 F.3d 802, 809–10 (11th Cir. 2014); *United States v. Estupinan*, 43 F.3d 1336, 1338 (11th Cir. 2006); *United States v. Perlaza*, 439 F.3d 1149, 1158–60 (9th Cir. 2006); *United States v. Moreno-Morillo*, 334 F.3d 819, 824 (9th Cir. 2003); *see also United States v. Saac*, 632 F.3d 1203, 1209–11 (11th Cir. 2011) (holding a similar statute, the Drug Trafficking Vessel Interdiction Act, 18 U.S.C. § 2285, a valid exercise of Congress's power to "define and punish . . . Felonies committed on the high seas" despite the absence of a nexus requirement). At least one district court has expressly considered an argument identical to Reid's in holding the MDLEA a proper enactment under the Define and Punish Clause, as applied to foreign citizens aboard a stateless vessel in international waters. *United States v. Carvajal*, 924 F. Supp. 2d 219, 253, 260 (D.D.C. 2013). The *Carvajal* court recognized Professor Kontorovich's scholarly analysis, and its adoption by Judge Torruella, but was unpersuaded, concluding that it "ultimately simply reflects 'an opinion of what the law ought to be, not what it is.'" *Id.* at 253 (quoting *M'Ilvaine v. Coxe's Lessee*, 6 U.S. (2 Cranch) 280, 306 (1805)).

With this authority underfoot, I turn to Reid's challenge. I begin by stating the obvious: the Define and Punish Clause "does not explicitly require a nexus between the unlawful conduct committed on the high seas and the United States be established before Congress can punish that conduct." *Nueci-Peña*, 711 F.3d at 198 (citing U.S. Const. art. I, § 8, cl. 10). Reid, of course, does not contend that Congress may never prohibit conduct lacking a United States nexus under the Define and Punish Clause; he acknowledges that Congress may criminalize "Piracies" and "Offences against the Law of Nations" without requiring such a nexus. Assuming, for the moment, that Reid is right to segregate the Define and Punish Clause into three separate grants of power, his case depends on whether he can show that Congress's power over "Felonies committed on the high seas" is implicitly limited in a way that its power over piracy and international law crimes is not.

To that end, in step with Judge Torruella and Professor Kontorovich, Reid points to *United States v. Palmer*, 16 U.S. (3 Wheat) 610 (1818), *United States v. Furlong*, 18 U.S. (5 Wheat) 184 (1820), and *Smith* for the proposition that the Define and Punish Clause does not permit Congress to exercise universal jurisdiction over non-piracy felonies. *See, e.g.*, *Cardales-Luna*, 632 F.3d at 744–45 (Torruella, J., dissenting) ("*Furlong* prohibits Congress from attaching the jurisdictional consequences of [universal jurisdiction] to run of the mill 'felonies.'"); Kontorovich, *supra*, at 190 (quoting *Furlong*, 18 U.S. at 197) (interpreting *Furlong* to hold that Congress may not constitutionally punish mere felonies, as opposed to piracies, "committed by a foreigner upon a foreigner in a foreign ship"). These venerable cases, however, involved statutory, rather than constitutional, interpretation, and Reid's reliance on them is misplaced.

*Palmer* addressed whether the United States had jurisdiction under the Act of 1790, which prohibited robbery, murder, and certain other offenses on the high seas, "to try, and punish, foreign citizens who had, on the high seas, boarded and robbed a foreign-owned vessel manned by a Spanish crew." *Suerte*, 291 F.3d at 373; *Palmer*, 16 U.S. at 626. The Court, referring to the Define and Punish clause, stated that Congress was doubtless

empowered "to enact laws punishing pirates, although they may be foreigners, and may have committed no particular offence against the United States." *Palmer*, 16 U.S. at 630. The "*only* question" was whether Congress had done so. *Id.* at 630–31 (emphasis added). The Court held that it had not, reasoning that "it cannot be supposed that the legislature intended to punish" foreigners who committed non-piratical offenses aboard foreign ships. *Id.* at 632. Because such crimes are "offences against the nation under whose flag the vessel sails," and because every nation is capable of punishing such crimes aboard its own vessels, "no general words of a statute ought to be construed to embrace them when committed by foreigners against a foreign government." *Id.* at 632–33. The Court thus construed the statute as applying only to offenses committed aboard United States vessels. *Id.* at 633.

This limiting construction, however, was not compelled by the Court's interpretation of the Define and Punish Clause, or indeed by any inquiry into the scope of Congress's power. *See Suerte*, 291 F.3d at 373 (describing the Court's holding as the result of statutory interpretation). As the Fifth Circuit astutely observed, it was, rather, informed by the interpretive principle that an "act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Id.* at 373–374 (quoting *Murray v. The Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804)). The Court held merely that Congress's "true intent and meaning" was to extend United States jurisdiction only so far as customary under international law. *Palmer*, 16 U.S. at 634. Certainly it did not explicitly hold that, as a constitutional matter, Congress cannot prohibit non-piracy felonies committed by foreigners on foreign vessels. And any doubts as to the nature of Court's holding, engendered by language arguably consistent with Reid's view, evaporate in light of the Court's later pronouncement that, "notwithstanding a series of contested adjudications on [the Act of 1790], no doubt has hitherto been breathed of its conformity to the constitution." *Smith*, 18 U.S. at 158.

Reid's invocation of *Furlong*, which involved the same statute, fares no better. As the government correctly notes, the First Circuit has explicitly rejected the argument that

*Furlong* "held that Congress does not have the power to punish felonies on the high seas that have no nexus to the United States." *Nueci-Peña*, 711 F.3d at 198 n.7. As the court explained, *Furlong* was, like *Palmer*, simply "a case about statutory interpretation," and the Supreme Court held no more than that the statute in fact prohibited the defendants' piratical conduct. *Id.*; *accord Saac*, 632 F.3d at 1209–10. The First Circuit characterized as mere dicta *Furlong*'s language that "the Act of 1790 could not 'extend [to] the punishment of murder' on the high seas by a foreign crew member against another aboard a foreign vessel because piracy (the crime covered by the statute) is the 'crime within the acknowledged reach of the punishing power of Congress.'" *Nueci-Peña*, 711 F.3d at 198 n.7 (quoting *Furlong*, 18 U.S. at 193–97). Moreover, even this dicta—upon which, along with other similar language, Reid relies—"does not stand for the broad proposition that Congress cannot punish felonies such as drug trafficking on the high seas that bear no connection with the United States under the MDLEA." *Id.*[4]

The *Nueci-Peña* court similarly rebuffed the interpretation of *Smith* advanced by Reid. *Id.* In that case, the sole issue "was whether the Act of 1819's definition of piracy referencing the law of nations was within Congress's power to define and punish piracies." *Id.* (citing *Smith*, 18 U.S. at 158–60). The Court held only that the definition "was a constitutional exercise of Congress's power to define piracies and that piracy is defined by the law of nations as 'robbery upon the sea.'" *Id.* (citing *Smith*, 18 U.S. at 160–62). While *Smith* may support Reid's claim that Congress's Article I authority over "Piracies" does not extend to drug trafficking, it has nothing to say about the scope of the power to "define and punish . . . Felonies committed on the high seas."

---

[4] The *Nueci-Peña* court's discussion of *Furlong* was not itself dicta—that is, "observations relevant, but not essential, to the determination of the legal questions then before the court." *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 459 (1st Cir. 1992). Had the court agreed with the defendant's (and Reid's) interpretation of *Furlong*, it could not have held, in the face of binding Supreme Court precedent, that his conviction was not the result of plain error. The court's contrary reading was therefore essential to its ultimate holding. In any event, "courts often, quite properly, give considerable weight to dictum—particularly to dictum that seems considered as opposed to casual." *Id.*

Case 3:14-cr-00747-CCC   Document 33   Filed 05/06/15   Page 10 of 14

United States v. Reid-Vargas, Criminal No. 14-0747 (CCC/BJM)                                    10

In sum, *Palmer*, *Furlong*, and *Smith* do not say what Reid claims they do. And without these cases as support, Reid's argument is untenable. "Statutes duly enacted by Congress are presumed to be constitutional," and Reid bears the burden of showing that the MDLEA is constitutionally unsound. *United States v. Sampson*, 486 F.3d 13, 20 (1st Cir. 2007). He has not met this burden. Besides the cases already discussed and discounted, he has provided no binding or persuasive authority for the proposition that Congress's Article I power over "Felonies on the high seas" extends only to conduct bearing a nexus to the United States.[5] Absent such authority, and in light of the considerable caselaw holding or suggesting that the MDLEA is a valid exercise of authority under the Define and Punish Clause, I cannot reasonably conclude that the "Felonies" power is subject to an implicit nexus requirement. Reid's as-applied constitutional challenge therefore must fail.

Moreover, even if the cases upon which Reid relies supported the existence of a nexus requirement generally, it is clear from contemporaneous cases that no nexus is necessary for conduct occurring, like Reid's, aboard a stateless vessel. *United States v. Holmes*, 18 U.S. (5 Wheat) 412, 416–18 (1820); *United States v. Klintock*, 18 U.S. (5 Wheat) 144, 151–52 (1820). *Klintock* and *Holmes* considered whether the Act of 1790, held by the Court in *Palmer* not to apply to offenses aboard *foreign* vessels, could yet cover offenses aboard *stateless* vessels. In *Klintock*, the Court answered in the affirmative, holding that

---

[5] The arguments of Judge Torruella and Professor Kontorovich, to which Reid liberally refers, largely depend on the readings of *Palmer* and (especially) *Furlong* that I have rejected. Reid also cites a statement by the Second Circuit that "[t]he class of crimes subject to universal jurisdiction traditionally included only piracy." *United States v. Yousef*, 327 F.3d 56, 108 (2d Cir. 2008). *Yousef* is inapposite. It was not a case about Congress's power under the Define and Punish Clause; the cited statement was part of the court's discussion about whether a federal terrorism statute should be read to apply extraterritorially in light of customary international law. *See id.* at 90–111. Finally, Reid's citation of James Madison does not support the assertions that the "Felonies" power extends only to "the conduct of U.S. nationals," Mot. 5, and that "there is no indication that at the Framing the Felonies power was thought to apply to offenses by foreigners on foreign vessels," *id.* 6. *See* The Federalist No. 42, at 216 (James Madison) (George W. Carey & James McClellan eds., 2001) ("The power to define and punish piracies and felonies committed on the high seas, and offences against the law of nations, belongs with equal propriety to the general government; and is a still greater improvement on the articles of confederation. These articles contain no provision for the case of offences against the law of nations; and consequently leave it in the power of any indiscreet member to embroil the confederacy with foreign nations.").

certain offenses, if committed on the high seas "by persons on board of a vessel not at the time belonging to the subjects of any foreign power, but in possession of a crew acting in defiance of all law, and acknowledging obedience to no government whatever," fell within the statute and within the jurisdiction of the United States. 18 U.S. at 152. In *Holmes*, the Court reaffirmed *Klintock* and clarified that the stateless vessel exception to *Palmer* applied even to foreign citizens. 18 U.S. at 418. If, as Reid argues, *Palmer* and *Furlong* interpreted the Constitution, not merely the Act of 1790, so too, presumably, did *Klintock* and *Holmes*, and the latter pair thus demonstrate that there is no constitutional impediment to the MDLEA's prohibition of drug trafficking aboard stateless vessels on the high seas. *See* 46 U.S.C. § 70502(c)(1)(A) (providing that the Act covers vessels "without nationality").

Reid wisely concedes as much, acknowledging that "[a]t the same time that the Supreme Court rejected the application of [universal jurisdiction] over foreign vessels in cases of murder and other felonies, the Court seemingly extended jurisdiction to crimes committed on stateless vessels even in the absence of a U.S. nexus." Mot. 8; *see also Cardales-Luna*, 632 F.3d at 747 (Torruella, J., dissenting) ("These principles regarding [universal jurisdiction] have been relaxed to include, in addition to piracy, . . . the case of stateless vessels."); Kontorovich, *supra*, at 1228 (acknowledging that *Klintock* and *Holmes* may be read as holding that the Define and Punish Clause permits the punishment of felonies aboard stateless vessels on the high seas). But, he claims, because the MDLEA's definition of "vessel without nationality" is broader than the definition of "stateless vessel" under customary international law, the blows dealt to his case by *Klintock* and *Holmes* are less than mortal.

Under the MDLEA, a "vessel without nationality" includes a vessel, like Reid's *Secret Magic*, aboard which the master makes a claim of registry that is not unequivocally confirmed by the relevant nation. 46 U.S.C. § 70502(d)(1)(c). But under international law, Reid says, "stateless vessel" means only one in fact "not registered by any state, or whose registration involves some subterfuge, such as flying multiple flags, or flags of state with

which the vessel has no connection." Kontorovich, *supra*, at 1221 (citing United Nations Convention on the Law of the Sea arts. 91–92, Nov. 16, 1994, 1833 U.N.T.S. 438; Convention on the High Seas arts. 5–6, Apr. 29, 1958, 13 U.S.T. 2312). Thus, the argument goes, the MDLEA impermissibly allows jurisdiction over vessels that may not be *truly* stateless; even a vessel actually registered in a foreign nation may fall within the statute if the nation of registry fails to stake a claim in no uncertain terms.

Even assuming that a constitutional conception of statelessness may not extend further than under international law—a dubious proposition, and one for which Reid offers no support—the MDLEA is not, in fact, an example of such broadening.[6] The Act, it is true, treats some vessels as stateless even when the claimed nation of registry does not altogether disclaim jurisdiction; but this is simply a matter of the proof required to find that a vessel is "not registered by any state." Congress decided that equivocation in response to a claim of nationality was sufficient to justify treating a vessel as stateless, and that decision was both reasonable and consistent with international law. As the First Circuit has observed, "the stateless vessel concept in the MDLEA *and in international law* is designed *prudentially*. The controlling question is whether . . . [the] master is prepared to make an affirmative *and sustainable* claim of nationality." *Matos-Luchi*, 627 F.3d at 6 (first and third emphases added). In short, under international law, "[i]t is not enough that a vessel have a nationality; she must claim it and be in a position to provide evidence of it." *Id.* (quoting Andrew W. Anderson, *Jurisdiction over Stateless Vessels on the High Seas: An Appraisal Under Domestic and International Law*, 13 J. Mar. L. Com. 323, 341 (1982)).

A master who makes a claim of registry that the claimed nation is not prepared to affirm is not "in a position to provide evidence" of his vessel's nationality. This is particularly true given that "the nationality of a vessel is determined in accordance with the law of the state to which she claims to belong." Anderson, *supra*, at 339–40 (citing *Lauritzen*

---

[6] Reid lacks standing to object to the MDLEA purely on the ground that it violates international law. 46 U.S.C. § 70505; *Matos-Luchi*, 627 F.3d at 6.

*v. Larsen*, 345 U.S. 57 (1953)). The claimed nation of registry holds all the cards; requiring it to affirmatively assert ownership offends neither common sense nor international custom, which "treats the 'stateless vessel' concept as informed by the need for effective enforcement." *Matos-Luchi*, 627 F.3d at 6.

In sum, even if the Define and Punish Clause requires a United States nexus in the case of legitimately foreign vessels, there is no such requirement for stateless vessels on the high seas.[7] Reid's alleged conduct occurred on the high seas aboard a vessel properly considered stateless under the MDLEA and international law. The MDLEA is thus constitutional as applied to Reid.[8]

## III.   The MDLEA as an Ex Post Facto Law

Reid next argues that, as applied to his alleged conduct, the MDLEA is a constitutionally impermissible ex post facto law. *See* U.S. Const. art. I, § 9, cl. 3. This is so, he says, because his conduct was not covered by the Act until Costa Rica failed to confirm or deny his claim of registry; only at that point, after defendants had jettisoned their bales of marijuana, was the *Secret Magic* a "vessel without nationality." This argument, though creative, is specious. To qualify as ex post facto, a law "must be retrospective, that is, it must apply to events occurring before its enactment." *Weaver v. Graham*, 450 U.S. 24, 29 (1981). That is not the case here; Reid allegedly engaged in drug trafficking aboard a stateless vessel well after the MDLEA was enacted in 1986. It makes no constitutional difference that the *Secret Magic* did not fall within the terms of the statute until the Coast Guard spoke with

---

[7] I note that Judge García-Gregory recently came to same conclusion, though he took a somewhat different path. *United States v. Aybar-Ulloa*, Criminal No. 13-518 (JAG) (D.P.R. Dec. 22, 2014, Docket No. 83). The court held that "a showing of statelessness moots the nexus requirement issue, in that international law allows the United States 'to treat stateless vessels as if they were its own.'" *Id.*, slip op. at 7 (quoting *United States v. Smith*, 680 F.2d 255, 258 (1st Cir. 1982)).

[8] Because I conclude that, as applied to Reid, the MDLEA is a valid exercise of Congress's power over "Felonies committed on the high seas," I need not consider Reid's argument that drug trafficking is not an "Offence[] against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. For the same reason, I do not consider Reid's argument that the MDLEA is not a valid exercise of Congress's power to enact laws in service of implementing treaties. *See Missouri v. Holland*, 252 U.S. 416, 433 (1920).

Costa Rica. *See United States v. Alomia-Riascos*, 825 F.2d 769, 772 (4th Cir. 1987) ("The fact that Barbados consented to enforcement of [the MDLEA's predecessor] against Defendants after the *Mary Gloria* had been boarded and searched simply does not constitute a violation of the prohibition against *ex post facto* laws.").

## CONCLUSION

For the above reasons, Reid's motion to dismiss the indictment should be **DENIED**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1)(B) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within 14 days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 6th day of May, 2015.

*S/ Bruce J. McGiverin*
BRUCE J. MCGIVERIN
United States Magistrate Judge